## LYONS v. CHICAGO, M. & ST. P. RY. CO.

A railroad company is not liable for injuries caused by horses upon a street or other premises near a railroad track becoming frightened at the ordinary appearance of a train or cars under careful management.

In an action for injuries to plaintiff by the frightening of her team by the alleged improper blowing of a locomotive whistle, the burden is upon the plaintiff to prove that the proximate cause of her injury was the improper use of the whistle.

In view of Civ. Code, § 2430, which declares that the law never requires impossibilities, a locomotive engineer is not required to keep a lookout for frightened horses on parallel highways.

Under Civ. Code, § 538, which provides for signals at a distance of at least 80 rods from a railroad crossing, to be continued until the crossing is passed, and makes a railroad company liable for all damages sustained by reason of such neglect, the use of either whistle or bell all the time occupied by a train in passing from one public crossing to another a mile distant is permissible and the blowing for a private crossing between two of the crossings is not negligence.

On appeal from the overruling of a motion for a directed verdict, the defendant's evidence should be disregarded, where conflicting.

Evidence in an action against a railroad for injuries to plaintiff from frightening her horses while driving on a parallel highway by blowing the whistle where it should not have been blown, and in an unusual manner, **held** to require a directed verdict for the defendant.

An instruction in an action for personal injuries from the frightening of plaintiff's horses by a locomotive whistle while driving on a parallel highway, from which the jury might understand that they might find for the plaintiff if they believed that good railroading did not justify whistling for a private crossing, is erroneous.

Corson and Whiting, J J., dissenting.

(Opinion filed October 3, 1911.)

Appeal from Circuit Court, Pennington County; Hon. LEVI McGEE, Judge.

Action on rehearing. Former decision reversed.

For former opinion, see 26 S. D. 333, 128 N. W. 134.

*Charles W. Brown, J. D. Elliott,* and *Charles E. Vroman* for appellant. *Wood & Edwards,* for respondent.

HANEY, J.  This is an action to recover for personal injuries alleged to have been caused by the negligent operation of one of the defendant's engines.  At the time of the accident the plaintiff was driving westerly on a public highway parallel to the defendant's track, on which one of its engines, with freight cars attached, was moving in the opposite direction.  As the train passed plaintiff's team became freightened, one of the horses plunged violently, the pole of the vehicle was broken; plaintiff being thrown out and injured.  The trial of the cause in the circuit court resulted in a judgment for the plaintiff, from which and from an order denying its application for a new trial the defendant appealed.  In a former decision of this court the judgment was affirmed.  Lyons v. Railway Co., 26 S. D. 333, 128 N. W. 134.  Subsequently, a rehearing having been granted, the cause was again argued and submitted.

The errors assigned relate to the refusal of the court to direct a verdict for the defendant, the sufficiency of the evidence to justify the verdict, and to the instructions.  The only negligence charged is in the use of the engine whistle.

[1, 2] The complaint will be construed as alleging (1) that defendant's servants blew the whistle where it should not have been blown; (2) that they blew it in an unusual manner; and (3) that they continued to blow it after they were aware of the plaintiff's peril.  Any negligence on the part of its servants is denied

by the defendant.   It is well settled that a railway company is not liable for injuries caused by horses upon a street, highway, or other premises near a railway track becoming frightened at the ordinary appearance and movements of a train or cars under prudent and careful management.   33 Cyc. 1148.   Therefore the burden was upon the plaintiff to prove that the proximate cause of her injury was the improper use of the engine whistle.   With the issues and law applicable thereto thus defined the refusal of the court to direct a verdict for the defendant will be considered.

Defendant's train, consisting of an engine, ten cars of live stock, and a caboose, in charge of a conductor, two brakemen, an engineer, and fireman, all competent and experienced trainmen, entered "Stony Cut," five miles east of Rapid City, where the accident occurred, at about 11 o'clock in the forenoon, running at the rate of 25 or 30 miles an hour.   The engine was equipped with a standard steam whistle in proper condition.   The engineer was in his proper place, sitting on the right side of the engine cab.   Stony Cut was between two public crossings, one mile apart, the one west of the cut being known as the "Read crossing" and the one east of it as the "Woods crossing."   Between the cut and the Read crossing was a private road known as the "Lewis crossing."   Between the cut and the Woods crossing were two private crossings.   Concerning the circumstances attending the accident, the plaintiff testified: "The train was going east, and we were going west. * * * As we came to the top of the hill, the train whistled at the Read crossing, and at the Lewis crossing it passed without whistling. * * * The train when it commenced whistling was only a little ways ahead of us, not quite upposite.   I observed two men in the engine, and one looking out at the window on my side. * * * I was next to the railroad track. * * * When the horses saw the train coming, they both held up their heads and pricked up their ears, and, when the whistle blew, the one next to the train threw himself against the other, and kept lunging and turned his head to see the engine, and it continued that way lunging and jumping probably 175 feet, when

the tongue broke, and the last I remember the whistle was still blowing. As to the position of the train about the time the tongue broke, it had passed us. I saw the caboose going by us, and that is the last I remember. I must have been thrown out right after it passed us. * * * As to whether the lunging of the horses commenced when the train was opposite me, it commenced just as soon as the whistle blew. One of the fellows in the cab was looking out of the window. * * * The only time the train whistled was for the Read crossing and when they were in the cut. * * * It didn't whistle after it left the Read crossing until it whistled in the cut. It didn't whistle at the Lewis crossing. The train was in the cut, I should judge, the length of the train before it whistled." Assuming there would have been no accident if the whistle had not been blown, and viewing her testimony in the light most favorable to the plaintiff, it is manifest that her right to recover must rest on the theory that it was the blowing of the whistle when the engine was in the cut nearly, or directly, opposite to her team, which caused her injury.

As to whether prudent and careful management required the blowing of the whistle for the private crossings east of the cut, as the train entered the cut, the engineer testified: "Good railroading and a regard for the safety of the train, passengers, and freight would require whistling at such a point." If what constituted proper management when approaching these private crossings called for expert evidence, and the plaintiff is not in position to assert the contrary, the engineer's testimony having been received, a jury would not be justified in disregarding it because it was not contradicted. Nor would its contradiction have raised a material issue. The question is whether the engineer was guilty of negligence in blowing the whistle for the private crossings; not whether he would have been guilty if he had not done so. The statute provides: "A bell at least thirty pounds weight, or a steam whistle, shall be placed on each locomotive engine, and shall be rung or whistled at the distance of at least eighty rods from the place where the said railroad shall cross any other road or street, and be kept ringing or whistling until it

shall have crossed said road or street, under, a penalty of fifty dollars for every neglect, to be paid by the corporation owning the railroad, one-half thereof to go to the informer, and the other half to this state, and also be liable for all damages which shall be sustained by any person by reason of such neglect." Rev. Civ. Code, § 538. The train in this case was moving at the rate of at least 25 miles per hour in the country, where the speed of trains is not limited by law, and where the steam whistle is properly employed to give warning of approaching trains. Presumably there is a public crossing at least once in every mile; the statute declaring, with certain immaterial exceptions, that every section line shall be a public highway. Rev. Pol. Code, § 1594. The usual speed of trains beyond the boundaries of cities and towns is about 30 miles per hour. A train moving at that rate moves one mile in two minutes. Eighty rods is one fourth of a mile. So, ordinarily, if the requirements of the statute are observed, the bell will be ringing or the whistle will be blowing at least one-fourth of the time occupied by the train in passing from the yard limits of one station to the yard limits of another. While, perhaps, the primary purpose of the statute relating to the bell and whistle was to avoid accidents at public crossings, compliance with its provisions is equally well calculated to promote the safety of travelers on parallel and adjacent highways by giving them timely warning of approaching trains. The sound of a steam whistle when blown for a private crossing serves the same purpose that it does when blown for a public crossing. In either case it is an ordinary incident of the operation of a train. Therefore, though neither the statute nor "good railroading" may have required the engineer to whistle for these private crossings, a question concerning which no opinion is expressed, it does not follow that his having done so consituted negligence per se.

[3] The situation of a person on a parallel highway and that of a person crossing the track is different. The engineer's duty with respect to each is not the same. When his train is moving 25 or more miles per hour, he is bound to give constant attention to its operation, the condition of the track, its grade,

curves, and crossings; but he is not required to keep a lookout for frightened horses on parallel highways. Indeed, it is impossible for him to do so, and "the law never requires impossibilities." Rev. Civ. Code, § 2430. To conclude that the exercise of excessive caution and care for the safety of the train and persons who may be crossing the track in itself constitutes negligence would be absurd. If the blowing of the whistle in this case had been for a public crossing, the plaintiff could not have complained, though it caused her injury. If she had been injured on one of the private crossings and the whistle had not been blown, we apprehend she would have contended that the failure to blow it constituted negligence.

[4] Moreover, the blowing of the whistle for these private crossings was permitted if not required by the statute. It required the bell or whistle to be "rung or whistled at the distance of at least 80 rods" from the Read and from the Woods crossings, and to be "kept ringing or whistling" until each was passed. So the statute expressly required the use of the bell or whistle one-fourth of the time, and impiledly permitted the use of either all the time occupied by the train in passing from the one public crossing to the other. Clearly, then, the blowing of the whistle, which is claimed to have frightened the plaintiff's horses, did not constitute negligence merely because it was blown for a private crossing.

[5] Was the whistle blown in such an unusual manner as to render the defendant liable? The engineer swore that he gave the customary crossing signal, "one long and two short." One or more of defendant's witnesses testified that the train made no unusual noise. If, however, there was any conflct as to this matter, defendant's evidence should be disregarded in reviewing the ruling on its motion for a directed verdict. In addition to the plaintiff's testimony heretofore given, her son, who was driving the team, testified: "I noticed the train whistling for the Read crossing. I can't say how it whistled just before it got to it. As to when it whistled again, it was just about even with our team before it whistled again, somewhere in front of us, just a little.

* * * As to the whistle, it was still whistling after the team got away. As to how far we had gone from the time the horses started to jump from when the whistle first began, about 150 feet or something like that, coming this way. The whistle was still blowing when my mother was thrown out." Robert Holcomb, a witness for the plaintiff, testified: "Before the train got to me, I could see them quite a ways up in the cut. I heard them whistle. As to what kind of a whistle it was, pretty near all kinds I guess. * * * Q. Now state whether or not from the time you first heard the whistle starting to blow at what you call the west end of the cut until it passed you it was continually whistling? A, Well, yes; kind of a long whistle and a few toots mixed in with it is the way I would express it." Maurice Kelliher, another witness for the plaintiff, stated on direct examination: "As to the whistling being long contiued or not, well I don't know as to that any more so than to any other particular time. I would not think it was anything unnatural. I did not notice it being any longer than at any other time." This was all the evidence on the part of the plaintiff as to the manner in which the whistle was blown. It certainly did not justify the conclusion that the engineer's conduct was wanton or reckless. It would seem to justify no conclusion other than that the customary crossing signal, one long and two short blasts, was given. But, assuming · a jury might find that the whistling was continued for several rods, that fact alone would not render the defendant liable, for the reason that the statute expressly requires the bell or whistle to be kept ringing or whistling for a distance of at least 80 rods at every public crossing, and impliedly permits ringing or whistling continuously during the progress of the train. It follows that the defendant was entitled to a directed verdict unless the evidence justified the conclusion that the whistle was negligently blown after the engineer was aware of the plaintiff's peril.

It conclusively appears that the engineer did not and could not have seen the plaintiff's team before the whistle was blown. The plaintiff herself says: "The engine had not got beyond our team when it whistled. It had not got to it. Our team was a

little easterly of the engine, just a little ways. It seems we were almost to the engine. We could look right at the engine. The engine whistled just before we got opposite to it. It was not as far as across this room, side ways of the room. * * * I saw two men in the cab and one of them looking out of the window, on the left hand or northerly side of the engine, going east." The engineer, who was on the right side of the cab, says: "I did not see the plaintiff in this case or the team or any team before I whistled in the cut. * * * My attention was not called by any officers of the road to the accident the next day or next day but one after the accident. The fireman spoke something about some team being scared at the time, but I did not see it." He could not have known that the plaintiff's horses were, or were likely to be, frightened otherwise than through information derived from the fireman. Both the plaintiff and her son stated positively there were no indications of fright until the whistle was blown. The fireman could not have discovered indications of danger before they existed, even if he saw the team before the whistle was blown. All that is material to this phase of the case must have transpired almost, if not, instantaneously. Hence the conclusion is irresistible that the engineer was not aware of any danger to the plaintiff before the whistle was blown and the mischief accomplished. Upon more mature reflection, the court is satisfied it gave undue effect in its former decision to the statement of the engineer that "the fireman spoke something about some team being scared at the time." The fireman would not speak of a team being scared before it was in fact scared.

[6] The plaintiff's cause of action rests on the hypothesis, and her evidence conclusively shows that the team was not scared before the whistle was blown. Clearly, then, the evidence disclosed by the record on this appeal does not justify the conclusion that the engineer was aware of the plaintiff's danger in time to have avoided it by not blowing the whistle for the private crossings, and it is unnecessary to determine what his conduct should have been if he had been aware of such danger. The motion for a directed verdict should have been sustained.

[7] The court charged the jury on its own motion as follows: "You are further instructed, gentlemen of the jury, that if you believe from the testimony in this case that beyond the cut where the whistle is alleged to have commenced blowing there was a private crossing, and that the view from the engine was obstructed by the cut so that stock or persons approaching the private crossing could not be seen, it was entirely proper and in accordance with good railroading for the engineer to blow his whistle at this point, and, if the accident occurred by reason of the team becoming frightened and running away because of the blowing of the whistle in the ordinary and usual manner, then the plaintiff cannot recover, unless you further believe from the testimony that the person in charge of the said engine saw and knew that the plaintiff's team was becoming frightened at said whistling, and by the exercise of ordinary care could have stopped the whistling in time to have prevented the injury. That is the point in this case, gentlemen of the jury, you have got to pass on. The mere whistling of the engine at this point was not negligence on the part of the defendant. If there was any negligence, it was by reason of the using of the whistle to such an extent as to cause this accident after they knew the peril the plaintiff was in." This charge would have been erroneous notwithstanding the concluding clause, even if the evidence had justified a finding that the whistle was negligently blown after the engineer knew of the plaintiff's peril, for the reason, if no other, that the jury would understand they might find for the plaintiff if they believed that good railroading did not justify whistling for the private crossings.

The former decision of this court is overruled, and the judgment of the circuit court reversed.

CORSON, J., dissenting.

WHITING, J. I dissent from the above opinion, and would base my dissent solely upon the ground that I believe there was ample evidence to warrant submitting to the jury the question whether or not defendant, through the fireman, did not have notice of the impending accident in time for such accident to have been averted if defendant's employes had acted immediately.