ELLA H. WHEELER, Appellant, v. WABASH RAILROAD COMPANY, Respondent.

Kansas City Court of Appeals, November 6, 1911.

NEGLIGENCE: Railroads: Frightening Horses. Plaintiff and another were driving in a two-horse buggy on a public highway which paralleled a railroad track. The team took fright at a passing freight train going in the opposite direction, ran away upset the buggy and injured plaintiff. The engine was 150 feet away from the horses when they exhibited signs of becoming unmanageable; the engineer began whistling for a public crossing at the place for that signal when the engine was opposite the team; one of the occupants of the buggy signaled the engineer to stop whistling at the first blast, and the engineer was then looking in the direction of the team; the whistle was sounded six times; the team became unmanageable at the first or second blast, and on account of the blowing of the whistle. *Held,* that the trial court properly directed a verdict for the defendant for the reason that the perils of the wayside traveler occasioned by noises and sights necessarily produced in the running of trains in the country on schedule are things the traveler must guard against, and are not perils the operators of trains must watch for and prevent.

Appeal from Boone Circuit Court.—*Hon. N. D. Thurmond,* Judge.

AFFIRMED.

*Charles J. Walker* and *A. B. Wheeler* for appellant.

(1)  Defendant's engineer saw plaintiff and discovered her perilous position; he should have discontinued the whistling or stopped his train.  Smith v. Railroad, 53 S. W. 269, and cases cited; Stanger v. Railroad, 32 N. E. 209; Phelan v. Paving Co., 207 Mo. 666, 710.  (2)  Under the evidence in this case the plaintiff was entitled to the verdict of the jury on the question of negligence.  It is only when the facts are of such a character that all reasonable men must draw the same inference that it becomes the duty of the court to decide the question of negligence as one of law.  Ward v. Maine Central Co., 96 Me. 136; Hanlon v. Turnpike Co., 182 Pa. St. 115; Railroad v. Box, 17 S. W. 375; Railroad v. Syfan, 43 S. W. 551.  (3)  It was negligence in the engineer to sound the whistle in such close proximity to plaintiff's team.  Brown v. Railroad, 89 Mo. App. 192; Feeny v. Railroad, 123 Mo. App. 420, 428; Fulton v. Railroad, 39 So. 282; 23 Am. and Eng. Ency. Law, p. 744.  (4)  Under the circumstances of this case defendant's failure to suspend the whistle of the engine was an act of wantonness and negligence.  Cole v. Railroad, 121 Mo. App. 605; Beckenwald v. Railroad, 121 Mo. App. 595; Phelan v. Paving Co., 115 Mo. App. 423.  The dictates of humanity should have prompted the engineer to suspend the whistle when he discovered its effect upon plaintiff's team.  Morgan v. Railroad, 159 Mo. 262, and cases cited; Oates v. Railroad, 168 Mo. 535; O'Donnell v. O'Neill, 130 Mo. App. 360.

*J. L. Minnis* and *E. W. Hinton* for respondent.

(1) Since the plaintiff relied on negligence in sounding unusual or unnecessary whistle signals, or in continuing them after the team became frightened, the burden was necessarily upon her to affirmatively prove that the accident was caused by negligence in some one or more of these particulars. Webb v. Railroad, 52 Atl. 5; O'Brien v. Railroad, 118 N. Y. S. 1025; Feeney v. Railroad, 123 Mo. App 420. (2) There was a total failure to prove that the sounding of the whistle in the first instance was either unusual, unnecessary or improper under the circumstances. Berry v. Railroad, 66 Atl. 386; McCandless v. Railroad, 93 S. W. 1040. The operators of the train were under no legal duty to look out for travelers on adjoining highways, or refrain from the ordinary and necessary signals and noises of operation merely because horses in that vicinity might become frightened thereby. Lamb v. Railroad, 140 Mass. 79; Railroad v. Walkenshaw, 81 Pac. 463; Whistenaut v. Railroad, 59 S. E. 920; Railroad v. Smith, 53 S. W. 269; McCandless v. Railroad, 93 S. W. 1040; Faires v. Railroad, 77 Pac. 230; Rowe v. Railroad, 137 S. W. 511; Feeney v. Railroad, 123 Mo. App. 420. There is no proof whatever that the engineer actually saw the plaintiff or her team at all, or was in the least aware of any peril, because the bare fact that the engineer could have seen the buggy, etc., furnishes no evidence that he did in fact see or became aware of the situation. Hall v. Railroad, 219 Mo. 588; Day v. Railroad, 52 Atl. 771; McGhee v. Railroad, 214 Mo. 522. (3) The plaintiff failed to make a case of negligence for continuing the whistle signals, because there was no evidence that the engineer was aware of the danger, or that he could have prevented the accident after the first whistle blast was sounded. Day v. Railroad, 52 Atl. 771; Hall

v. Railroad, 219 Mo. 588, and discussion under preceding point.

JOHNSON, J.—Action to recover damages for personal injuries alleged to have been caused by negligence of defendant. At the close of the evidence the court instructed the jury to return a verdict for defendant and plaintiff appealed from a judgment rendered on such verdict.

The injury occurred at midday October 24, 1909, on a public highway about one mile northeast of Columbia. Plaintiff and her niece, Miss Nellie Gray, were driving towards the northeast in a two-horse buggy and were on a part of the highway that adjoins and runs parallel to the right of way of defendant's branch line to Columbia, when the team took fright at a passing freight train coming from the northeast, ran away and upset the buggy, injuring plaintiff.

The highway was east of the railroad and the west half was macadamized or graveled, while the other half was an ordinary dirt road two or three feet lower than the graveled part. The team and buggy were using the graveled roadway and were about sixty feet from the railroad track at the time the team became unmanageable and, bolting away from the train, whirled the buggy on to the dirt road and upset it. The place of the accident was about opposite a whistling post for a road crossing known as the Keene crossing, approximately a quarter of a mile southwest. There was another road crossing called the Kurtz's crossing, about the same distance northeast and the whistling post for that crossing for northbound trains was about one hundred feet south of the whistling post for the Keene crossing, which was for southbound trains. Northeast of the post for the Keene crossing the railroad ran through a cut and plaintiff was unable to see the approaching train until the engine emerged from the cut at a point six hundred feet

or more in front of the team. The track was curved
slightly in a way to give the train the appearance
of coming head on and to cause the engineer to pay
close attention to the crossing ahead which was re-
garded as a dangerous crossing. The engine was in
front of the train, but was running backward at the
rate of twenty-five or thirty miles per hour. Conse-
quently the engineer was in the east side of the cab
and was leaning far out of the window watching the
track ahead of the tender. The team noticed the train
when the engine was about one hundred and fifty
feet from the Keene post, stopped and pricked up
their ears, but did not become unmanageable until the
engineer blew the whistle for the Keene crossing. On
this point Miss Gray testified:

"When they first saw the engine they stopped and
pricked up their ears and then when the whistle blew
they began backing. Q. At what point did they begin
to run? A. When the whistle began. Q. Had they
moved until after the whistle began? A. They had
shown fright and were backing. Q. Had they started
to run? A. No, I don't think so. Q. How near was
the engine to you when the whistling began? A. Al-
most opposite, just slightly opposite."

Plaintiff testified: "Q. When did your horses
show signs of fright? A. When they saw the train
approaching they stopped and began to swerve back
and then I saw I had no time to do anything and
planted my feet against the dashboard and thought I
could hold them in the road until they passed me and
then I would be all right. But they began whistling
when they passed me and kept it up repeatedly. Q.
The train was very close to them when the team began
to back? A. Not so close as when they began to whis-
tle. Q. Can you tell me how far they were when the
horses began to back? A. That would be a matter of
speculation. Q. Simply your best recollection of it.
Was the train a hundred feet from them when they

began to stop and back? A. A little farther, perhaps. Q. As much as two hundred feet from them? A. How wide is it across this room? Q. About forty or fifty feet, I suppose. I would say three times across this room—about one hundred and fifty feet, I would say. Q. When the horses began to show fright? A. When they first saw the train.''

These witnesses say that the whistle sounded six shrill blasts and that the team bolted at the first or second blast. Further Miss Gray testified that when the whistling began she motioned to the engineer who was looking towards them to stop the whistling but no attention was given the signal.

The evidence shows beyond dispute that the engineer was whistling for the Keene crossing at the lawful place for giving such signal and we think the weight of the evidence shows that he gave the usual signal—two long and two short blasts of the whistle. But the evidence of plaintiff that six blasts were given is substantial and we shall consider it in passing on the questions raised by the demurrer to the evidence.

For present purposes we shall regard as proved the following facts: First, that the engine was one hundred and fifty feet from the horses when they stopped and began to exhibit signs of becoming unmanageable. Second, that the engineer began whistling for the crossing at the place for that signal, that when the whistling began, the engine was opposite the team and that the whistle was sounded six times; third, that the team became unmanageable at the first or second blast; fourth, that one of the occupants signaled the engineer to stop at the first blast at a time when the engineer was looking in the direction of the team and, fifth, that the team became unmanageable on account of the blowing of the whistle.

The petition alleges "that the agents, servants and employees of defendant in charge of said engine and train of cars, without any necessity therefor, care-

lessly, negligently, unlawfully, wantonly and willfully and with a reckless disregard of plaintiff's safety began and continued to blow said whistle after they discovered or by the exercise of reasonable and ordinary care and diligence might have discovered plaintiff's peril and danger, and after they discovered or by the exercise of reasonable and ordinary care and diligence might have discovered that the blowing and continued blowing of said whistle had greatly increased plaintiff's peril and danger, and that the whistling of said engine was causing plaintiff's team to become frightened, unmanageable and to run away." It will be observed that the blowing of the whistle is the act on which the charge of negligence is predicated. There is no evidence that the whistle was not the ordinary locomotive whistle and we think the evidence of plaintiff discloses the immateriality of the controversy over the question of whether four or six blasts were given. If the team became unmanageable at the second or even third blast and immediately capsized the buggy, the additional whistling could not possibly have co-operaetd in the production of the injury and we are concerned only with negligent acts that had some place in the chain of causal events. The real question for our determination is whether or not the act of giving the usual crossing signal at the lawful place should be characterized, in the light of plaintiff's evidence, as a negligent breach of a duty defendant owed to plaintiff, a traveler on an independent but adjoining public highway.

First, we shall inquire into the nature of the duty, if any, defendant owed plaintiff and at the outset we must say that necessarily the duty of a locomotive engineer towards the drivers of horses on parallel highhighways in the country must be limited in its scope to harmonize it with other duties imposed on him by the rules of the statutory and the common law. Trains must be run on schedule and at high speed, crossing

signals must be given and it is the duty of an engineer to keep a lookout for crossings. All of the cases in this State, as well as those in the great majority of other jurisdictions, unite in saying that the perils of the wayside traveler occasioned by noises and sights necessarily produced in the running of trains in the country on schedule are things the traveler must guard against and are not perils the operators of trains must watch for and prevent. Of course it is the duty of an engineer in passing places where the railroad and a public road adjoin and parallel each other not to allow the engine to emit unusual and unnecessary noises and, further, many cases hold, we think properly, that where he actually sees that horses are becoming unmanageble and has the means at hand for preventing the infliction of an injury he should reasonably employ such means when he may safely do so. To illustrate with the facts of the present case: The statute, section 3140, Revised Statutes 1909, allows a crossing signal in the country to be given either by sounding the whistle or ringing the bell and though it is the usual practice to whistle, still, if the engineer had observed that the team of plaintiff was likely to break from under control and that blowing the whistle would excite the animals to the breaking point, the sounding of the whistle in the face of such knowledge, when the ringing of the bell would have constituted a legal performance of his duty towards the crossing, could appear in no other light than as a negligent and even flagrant violation of a duty born of the most elemental impulses of common humanity.

But the difficulty of plaintiff's position is that her evidence will not support a reasonable inference that the engineer was guilty of such breach of duty. In the. first place her own testimony that the engine was only one hundred and fifty feet away when the team first exhibited fright discloses that the engineer had less than three seconds in which to discover her plight and

to refrain from sounding the whistle—an act he then must have been preparing to perform. If this were a case where the engineer was duty bound to be on the lookout for plaintiff we would say that an inference requiring him to grasp the situation and alter his course of conduct in so short a time, to say the least, would be of very doubtful tenability. But in the absence of any duty to be on the lookout, plaintiff, to maintain her cause must show that the engineer had discovered her peril in time to save her by acts not inconsistent with his obligation to operate his train in a lawful and proper manner.

The evidence adduced by plaintiff presents the conclusion that the engineer discovered the peril in time to refrain from whistling as a product of the merest conjecture. Grant that the restive team was in the range of the engineer's vision when first he blew the whistle, that does not prove that he realized her peril or even noticed her or her team. He was in the very performance of a duty of the highest importance. He had to give a signal and look out for a dangerous crossing. When one's mind is concentrated on a special object or on the doing of a certain act, many extraneous things before his eyes are unseen or unnoticed. Apropos is the utterance of the Supreme Court in Hall v. Railroad, 219 Mo. 1. c. 588: "He might have had his face in the direction of plaintiff and no doubt did, because he was taking signals from the brakeman which required him to look in the direction of plaintiff, but this does not show that he saw the plaintiff, or saw and knew that the pole car was not in the clear. The evidence is not sufficient to convict the engineer, nor the defendant for the alleged negligence of the engineer."

The most that can be deduced from the evidence of plaintiff is that there is a possibility or even probability to support the belief that the engineer observed the peril in time to save plaintiff, but there also is de-

ducible from the same evidence a probability just as strong in support of the opposite belief which leaves us without evidence tending to actual proof and compels the conclusion that plaintiff has failed to discharge her burden of proof. What we have just said is aptly expressed in the following quotation from the opinion in Day v. Railroad, 52 Atl. 771 (Me.):

"Of course, it is possible that he noticed the handcar. Indeed, it may be quantitatively probable that he did. Quantitative probability, however, is only the greater chance. It is not proof, nor even probative evidence, of the proposition to be proved. That in one throw of dice there is a quantitative probability, or greater chance, that a less number of spots than sixes will fall uppermost is no evidence whatever that in a given throw such was the actual result. Without something more, the actual result of the throw would still be utterly unknown. The slightest real evidence that sixes did in fact fall uppermost would outweigh all the probability otherwise. Granting, therefore, the chances to be more numerous that the plaintiff's intestate did notice the handcar than that he did not, we still have only the doctrine of chances. We are still without evidence tending to actual proof. However confidently one in his own affairs may base his judgment on mere probability as to a past event, when he assumes the burden of establishing such event as a proposition of fact as a basis for a judgment of a court he must adduce evidence other than a majority of chances."

The learned trial judge committed no error in instructing a verdict for defendant and the judgment will be affirmed. It is so ordered. All concur.