St. Louis Southwestern Railway Company *v.*
Everett.

Opinion delivered October 16, 1916.

1. Railroads—injury to persons at crossing—duty to maintain lookout.—Plaintiffs were driving a team of mules, and as they approached defendant's tracks they discovered the approach of an engine. The mules became frightened, and rushed upon the tracks, and were struck by the engine, plaintiffs sustaining personal injuries. *Held,* in an action by plaintiffs for damages against the railway. company that it was for the jury to determine what were the exact facts as to whether or not a lookout was kept, and if kept, whether the plaintiffs were discovered by the employees of the railway company to be in a perilous position, and whether they were seen, or could have

been seen, by the exercise of ordinary care, in time to have prevented the injury.

2.  DAMAGES AMOUNT—PERSONAL INJURY—ACTION.—In an action for damages against a railway company for personal injuries, when plaintiffs were struck by an engine while crossing the tracks at a public crossing, the verdict of the jury, awarding damages, held not to be excessive.

Appeal from Monroe Circuit Court; *Thos. C. Trimble,* Judge; affirmed.

STATEMENT BY THE COURT.

The appellees instituted separate actions against the appellant alleging substantially in their respective complaints that on the 31st day of August, 1914, they were in a wagon and drove up to the crossing where appellant's track crossed Cypress street in the town of Brinkley and undertook to stop the team of mules after discovering appellant's engine at a distance of about 60 yards south of the crossing; that the mules became frightened and unmanageable and ran across the track in front of the engine; that the engine struck the appellees and threw them on the pilot of the engine, causing severe injuries, which they describe; that the appellant's servants, by keeping a proper lookout, could have discovered the perilous position of appellees in time to have stopped the train and avoided the injuries.

Appellee Everett alleged that he was damaged in the sum of $3,000 for which he prayed judgment, and appellee Moye alleged that he was damaged in the sum of $2,500, for his personal injuries, and in the sum of $25 for injury to his wagon, and $50 for injury to his mules, and prayed judgment for the amounts alleged.

Appellant answered, admitting that the mules became frightened and went up on the side of appellant's track and that the appellees were unable to hold them, and that the engine struck the wagon, but denied all other material allegations of the respective complaints, and set up that when the team became

frightened and started across the track in front of appellant's engine it was impossible to stop the train until after the injury was inflicted; that if the injuries occurred they resulted from the contributory negligence on the part of the appellees and the unruly condition of the mules.

Appellee Everett testified substantially as follows: Appellees were farmers, living near the town of Brinkley, Monroe County, Arkansas. On the day of the alleged accident they were in the wagon of Moye, driving east on Cypress Street, in the city of Brinkley. Cypress Street is 80 feet wide and runs east and west. They were approaching the crossing of appellant's railroad on Cypress Street. Appellant's main line runs north and south. There is a side or house track, some thirty feet west of the main track. Brinkley is a town of about 1,800 or 2,000 people, and there was much travel at that crossing. Appellee Moye drove up close to the sidetrack. Then after a passenger train that was then passing north had cleared the main line they started across. Just before they got on the main line another train came dashing in and scared the team and they ran away, going in a northeast direction, and about the time the wagon got straightened out on the track the engine ran into it.

Appellees first discovered the train that collided with them about sixty yards south, down the track and about where the switch went into the house track. At the time they discovered the train to the south they were going right towards the main line, between the side track and the main line, and just at that time the mules began to run. Appellees were about 65 yards from the engine when they first discovered it, when the mules began to run. They were "near plumb across the street" when the engine struck the wagon. From the place where the engine was first seen to where it struck the wagon was 275 feet. They saw the engine after they drove across the sidetrack; they were between the two tracks. They saw it coming about the time the mules got scared.

Witness Everett was asked: "If the mules had not got scared you would not have had any trouble?" and answered, ."I do not know that we would, and I do not know that we would not."   There were store-rooms on the south side of Cypress Street, near appellant's right-of-way which prevented appellees from seeing the engine that struck them until they had passed the corner of the last of these buildings going east.   After getting across the sidetrack they could see the engine.   After the engine struck the wagon the next thing appellee Everett knew they were taking him off the cowcatcher.   One arm and one leg were badly skinned and his shoulder was broken up.   The injuries to his arm and leg did not last long, but the injury to his shoulder lasted for a long time, and was not well at the time he gave his testimony on the 29th of November, 1915, more than a year after the injury occurred.   All of the injuries were painful and the injury to his shoulder had continued to pain him down to the time of the trial, and at that time he could not raise his shoulder.   He could not raise it because something seemed to stick in it when he attempted to raise it up.   He could not lift with that shoulder at all without suffering for a day or two.   He lost about two months time from his work on the farm on account of the injury, and was still, at the time of the trial, at least half disabled from doing his accustomed work. His services were worth $75.00 a month.

The testimony of appellee Moye corroborates substantially the testimony of Everett.   Moye was the owner of the team and was driving the same at the time of the accident.   He did not see the train that struck them until the mules became frightened.   They were then between the two tracks.   The mules were six or seven feet from the main track, on the south side of Cypress Street.   They ran in a northeasterly direction, and the wagon was on the north side of Cypress Street when the engine struck it.   After the collision witness was on the cowcatcher.   He was struck under the eye, on the back of the head, and on the left arm and hip.

The injury to the arm and hip lasted about six weeks. The injury to his head had never gotten well. Before this injury he never had the headache. Now his head hurt him nearly half the time. On account of the injury he was only able to do about half of the farm labor that he was accustomed to do. Such labor was worth from $38 to $40 per month. Witness' wagon was damaged to the extent of $10.00. The mule, before its injury, was worth $125 or $150; after the injury it was worth only $40.00.

On cross-examination, this witness testified that he was in between the sidetrack and the main track when he first saw the engine. He did not stop the mules after he got in there because he could not, as the mules were frightened. He turned his head to see what frightened the mules; was not looking for the train before that time, but if he had been he could not have seen it. He could have seen it after he got on the sidetrack, but did not look.

A witness by the name of Hill testified that he saw the accident. He saw the team, driven by Moye, cross the sidetrack and saw the mules begin to run. The appellees were trying to hold them. He could not see the train at that time because he was standing near the wall of the building and could not see more than ten feet.

Pretty soon the team turned to the left and got on the main track down the track, and the train appeared from behind the building, and he saw that it was going to catch the team and watched to see if it was going to get off on the opposite side, but the engine struck the team about twenty feet north of the crossing. Witness did not see anybody on the engine. He looked for them when the train approached, and on the side next to him there was nobody in sight. He did not see anybody at all. The engine was coming on and witness wondered why the bell was not ringing; he did not hear the whistle. Witness wondered why they did not put on brakes, and after the train struck the team it kept running on. There was nothing done to stop the

engine before it struck the wagon that witness could see. The engine struck the wagon about twenty feet north of Cypress Street, and the street is eighty feet wide. Witness could see the engine for a distance of 50 or 60 feet before it struck the wagon and team. The engine dragged the wagon ten or fifteen feet after striking it. They stopped in about ten or fifteen feet after striking the team and wagon. Witness was looking and did not see any brakeman on or close to the crossing at that time.

Appellees also testified that there was no brakeman at the crossing, and that there was no ringing of the bell or blowing of the whistle on the engine.

The physician in attendance upon the appellees at the time and after they were injured, testified describing the extent of the injuries. He stated, in answer to a question, that if appellee Moye had never had the headache to amount to anything before the accident, and that he had been afflicted with headache probably half the time since, that such headache might have resulted from the injury. If there had been a pain in his head for a year and a half it would indicate that there was some inflammation—a chronic form of inflammation, and same might be permanent. After describing the nature of the injury which appellee Everett received in his shoulder, the witness testified that he "could not say but what it was a permanent injury. Owing to his age and the absorption of the callous to date it rather appears it is permanent."

The fireman on the engine at the time of the accident testified that when he first discovered the team it was standing back from the house track. The team started up and came across the track and as they tried to stop them one of the mules stopped, but the other one started to run. When he first discovered the mules he did not think there was any reason to stop. He supposed the men in charge of the team would stop. They tried to stop the mules, but they started to run. The engine was about 25 or 30 feet from the road crossing when the team stopped the last time.

The engine made no particular noise except that the bell was ringing. It was running about 7 or 8 miles an hour. Witness was on the left side of the engine, next to the appellees. The engineer was on the right side, and witness did not think the engineer saw appellees. The first the engineer knew of it was when witness gave him a signal to stop. He then put on the emergency. When witness first saw the team he was about 50 or 70 feet south of Cypress Street, or along about that distance. Further along in his testimony, witness was asked if it was a fact that they were down at the switch, just about 200 feet south of the street, when they first discovered the team, and answered, "Somewhere near it. It was below the switch stand." Witness further stated, in answer to questions, that when he first discovered the team he was south of the switch stand; then he stated, "It must have been about at the switch stand." Further on in his testimony he stated that when the mules crossed the house track and one of them stopped and the other did not, the engine was about the switch stand. Witness then told the engineer to stop the train. Then he stated that when he notified the engineer it was "this side of the switch stand," and again stated that it was "somewhere along there." The witness further stated that a train going at the rate of six or seven miles an hour could be stopped in about 70 or 80 feet. Witness saw the flagman out there flagging and he looked out and saw the team coming up. The flagman was not flagging the engine. When witness saw the mules were going to run he gave the signal to stop.

The engineer testified that he first discovered the approach of the appellees when they were in about twenty feet of the crossing. The fireman gave him the signal to stop; he applied the brakes in the emergency and did everything in his power to stop. He was on the street when the signal was given to stop, and pretty close to the center. He was asked if the fireman did not notify him when he was down about the switch stand or between the switch stand and the street

that these parties were approaching and he answered, "No, sir." The bell was ringing. Witness did not see the team approaching until he received the signal to stop, and saw the mules ahead.

A witness testified on behalf of appellant that he first noticed the wagon and team at the time the brakeman was flagging them. The brakeman was near the crossing, looking west and waving his hand. The team, at that particular time, was about ready to approach the house track. They came to a stop, and then proceeded forward. The engine, at that particular time, was back some forty feet from the crossing. As the engine approached the crossing the mule on the right side made a lunge to go in ahead of the engine. Both men in the wagon took hold of the lines and tried to control the team; they could not do it, and it ran in ahead of the engine, in a northeasterly direction. There was no unusual noise made by the engine; the bell was ringing.

Another witness testified that he was flagman at the crossing and gave the appellees the signal to stop. The train at that time was coming up the main line. Appellees seemed to accept the signal and slowed down, but started up again. They came over the house track, next to the main line, and witness hallooed at them to hold up. They slowed down and the mules took fright at the engine and got away from them. The engine was twenty or twenty-five feet from where the mules took fright. When he first saw the engine it was perhaps two hundred feet south. Witness further testified that he was flagging both the train and the team on account of the team approaching; that the train, at that time, was somewhere about the switch, and that the wagon was ten or fifteen feet west of the house track. Witness stated that he continued to flag the train after he saw the team commence to run. Witness gave the sign for the train to stop.

Another witness testified that the mules stopped about twenty-five feet from the crossing, in between the house track and the main line. The mules were a

little nearer the crossing than the engine, and when they started to run the engine was right on them. The engine was right on the crossing when the team started.

Another witness testified that he was agent of the appellant at Brinkley. He heard someone making a noise that attracted his attention. He looked out of the window directly in front of him and saw the team momentarily stop; then they started again, running and jumping, and the appellees were trying to hold them. The width of Cypress Street was 80 feet. The street proper was travelled all the way across except where it crossed the railroad track. Where it crosses the main line of the railroad it was about 18 or 20 feet.

Witness was asked this question: "How far was the engine from the crossing at the time the mules approached and stopped?" and answered, "I could not see when the mules stopped. When they started again I could see the engine, and I should judge it was about 100 or 125 feet from this 18 or 20 foot crossing."

At the request of appellees the court granted their prayer for instruction as follows:

"You are instructed that even though you believe and find from the evidence in this case, that plaintiffs were negligent in driving upon, or dangerously near, defendant's railroad track when one of its trains was approaching, without looking and listening for said trains, and without stopping the team before approaching near to or crossing said track, or that said team became frightened and ran upon said track, yet, if you find from the evidence that if defendant's employees, or one of them in charge of said train, had kept a proper lookout, that plaintiffs would have been discovered in time to have avoided injuring them, or if you believe that defendant's employees in charge of said train discovered plaintiffs in a dangerous position and failed to use all means within their power to avoid injuring them and that by reason of the failure to keep such

lookout or to use such means, plaintiffs were injured, you should find for plaintiffs.''

Appellant duly excepted to the ruling of the court in granting the above prayer. The jury returned a verdict in favor of appellee Everett and assessed his damage at $2,000.00, and in favor of appellee Moye, and assessed his damages for personal injury in the sum of $750, and for damages to his wagon and team in the sum of $150. Appellee Moye entered a remittitur in the sum of $45.00. Judgments were entered in favor of the appellees, from which this appeal was taken.

*Edw. A. Haid, A. L. Burford* and *Hawthorne & Hawthorne,* for appellant.

1. The lookout statute has no application to this case. The theory upon which plaintiffs seek to recover is one of discovered peril and the burden was upon them to show that the peril was discovered in time to avoid the injury. There is some controversy as to the distance the engine was from the crossing at the time the approaching team was discovered, but there is no controversy as to when the team took fright. The employees were not required, under the law, to stop the engine or check its speed until they did discover, or could have discovered, the peril of plaintiffs, and there was no peril until the team took fright, and then it was too late. Defendant was in no way responsible for the injury and is not liable. 60 Ark. 409; 69 *Id.* 130; 77 *Id.* 174; 89 *Id.* 270; 99 *Id.* 226; 106 *Id.* 32; *Ib.* 530; 118 *Id.* 37; 4 N. E. 34. On the whole case the verdict should have been for the defendant.

2. The court erred in giving the first instruction for plaintiffs. Part of it is abstract and misleading.

3. The verdict is excessive. 79 S. W. 351; 76 *Id.* 402; 117 Ark. 47; 114 *Id.* 224. The injuries were not proved to be permanent and none of the cases found by us sustain verdicts so large as this. The

jury's minds must have been inflamed and the verdict, the result of passion and prejudice.

*G. O. Bogle* and *Manning, Emerson & Morris,* for appellees.

1.    There is ample evidence to sustain the verdict. Negligence was shown to the satisfaction of the jury. 119 Ark. 36 and cases cited.

2.    There is no error in the court's instructions. 107 Ark. 431; 108 *Id.* 326; 119 *Id.* 36.

3.    The verdicts are not excessive.    86 Ark. 587; 87 *Id.* 109; 95 *Id.* 220; 106 *Id.* 353; 90 *Id.* 108; 15 S. W. 456; 103 Ark. 374; 67 *Id.* 531; 92 *Id.* 350; 105 *Id.* 269.

WOOD, J. (after stating the facts.)    Counsel for appellant contend that there was no evidence to support the verdict and that the instruction given by the court was erroneous for the reason that the lookout statute has no application.    They say that while it is true that the employees of appellant discovered the appellees approaching the house track, yet the undisputed evidence shows that these employees did not discover that the mules were frightened and beyond the control of the appellees until it was too late for the employees, using all the means at their command, to stop the engine; that, although the fireman had discovered the wagon approaching the house track and the crossing, he did not know that appellees were ignorant of the approaching engine and did not know that appellees would not stop before undertaking to cross the track; that appellees did in fact stop, and the mules became frightened when it was too late for the employees to stop the train.

These contentions of the learned counsel are not tenable.    There is an irreconcilable conflict between the testimony on behalf of the appellees and that of appellant on the issues of fact.    And, besides, appellant's witnesses contradict each other, and the testimony of some of them is inconsistent and contradictory in itself.    In this hopeless conflict of the evidence, whether or

not appellant's servants were keeping a lookout, and whether or not they discovered that appellees were in a perilous position, or in the exercise of ordinary care might have discovered them in time to have avoided the injury, were issues of fact which it was the peculiar province of the jury to determine. The evidence is fully set forth in the statement, and it shows that there was substantial testimony to warrant the finding in favor of appellees on these issues.

(1) The jury was justified in finding from the testimony of the witnesses for the appellees, and also from the testimony of appellant's witness, the fireman, that, when the mules first began to run, the engine was about the switch stand, or close to the switch stand, which was between 195 and 210 feet from the place where appellant's engine collided with the wagon. The undisputed evidence shows that the fireman on the engine, had he been keeping a lookout, could have seen the appellees after the team crossed the side or house track. It further shows that the engine was running at the rate of seven or eight miles an hour, and that it could have been stopped within a distance of sixty or seventy feet. So there was ample testimony to justify the conclusion that appellant's servants either did not see the appellees when the mules took fright, or that if they did see them, they failed to exercise ordinary care to use the means within their power and control to avoid the injury. There was testimony to warrant a finding that the fireman was not in his place in the cab of the engine on the side from which appellees approached the crossing, and that he was therefore not keeping any lookout at all. True, the fireman testified that he was in his place and that he discovered appellees. His testimony is inconsistent and contradictory as to the exact place where he first discovered them. But it was for the jury to reconcile the conflicts in his own testimony and also between his testimony and the testimony of the other witnesses, and to find what were the exact facts as to whether or not the lookout was kept, and if kept, whether or not the

appellees were discovered by the employees of appellant in a perilous position, and whether or not they were seen, or could have been seen by the exercise of ordinary care, in time to have prevented the injury. But it could serve no useful purpose to discuss further the conflicts in the evidence.

The instruction given by the court was applicable to the facts presented, and correctly stated the law in conformity with many decisions of this court. *Central Railway Co. of Ark.* v. *Lindley*, 105 Ark. 294; *St. L., I. M. & S. R. Co.* v. *Gibson*, 107 Ark. 431; *St. L. & S. F. Rd. Co.* v. *Champion*, 108 Ark. 326; *St. L. Sw. Ry. Co.* v. *Wilson*, 119 Ark. 36.

(2) Appellant's counsel next contend that the verdicts were excessive. Giving the testimony in regard to the character and extent of the injuries its strongest probative force in favor of the appellees, as we must do, we cannot say that the verdicts assessing the damages for personal injuries were excessive.

Appellee Everett received a serious and painful injury to his shoulder, from which he had not recovered at the time of the trial, and which the attending physician stated might be permanent. Likewise the appellee Moye had received a severe and painful injury in his head, which had caused him much suffering, and from which he was also suffering at the time of the trial. A period of nearly a year and a half had elapsed from the time of the injuries, during which time the appellees had not only been suffering continuous pain, but, on account of these injuries, they had been only able to do about half as much farm work as they had done before the injuries were received. Under these circumstances we cannot say that the amount of the verdicts evidenced any passion or prejudice on the part of the jury.

The remittitur cured the excess in the amount of damages assessed for injury to the property.

There is no reversible error in the record, and the judgments must be affirmed.