GARNER *v.* MISSOURI PACIFIC RAILROAD COMPANY,
THOMPSON, TRUSTEE.

4-7916                                         195 S. W. 2d 39

Opinion delivered June 10, 1946.

*Bob Bailey* and *Bob Bailey, Jr.,* for appellant.

*Thos. B. Pryor* and *Brady Pryor,* for appellee.

ED. F. McFADDIN, Justice. A fast east-bound train of appellee passed through London, Pope county, Arkansas, during the afternoon of January 15, 1944. The appellant's team became frightened, and ran away, resulting in appellant's personal injuries and his property damage, for the recovery of all of which he filed action against appellee in the circuit court. At the conclusion of all of the evidence the court directed a verdict for appellee, and this appeal challenges the correctness of such action of the trial court.

At the outset, we reiterate the well-known rule that, in reviewing in this court the action of the trial court in directing a verdict, the evidence is given its strongest probative force in favor of the party against whom the verdict was directed. Cases so holding are collected in West's Arkansas Digest, "Appeal and Error," § 927(7). We therefore view the evidence in the light most favorable to the appellant.

The railroad track of the appellee runs approximately west to east through the town of London, and crosses two parallel highways or streets, which are about 300 feet apart. These crossings are designated as "west crossing" and "east crossing." Eggleston's Store is about 175 feet south of the railroad track, and about midway between the two parallel streets. The space is open between Eggleston's Store and the track and the two crossings. On the day in question appellant drove his team (a horse and a mare) and wagon to Eggleston's Store, and left the team, headed east and unattended and unrestrained, while he went in Eggleston's Store to do

some shopping. Being thus engaged, the appellant heard the train blow for the first or west crossing, and immediately returned to his team. He had just reached over the front wheel of the wagon to grasp the reins (wrapped around the spring seat) when the train was even with the team. The whistle blowing of the train caused the team to lunge and run away, and injure the appellant. The team headed northeast and ran into the third or fourth coach of the train at the east crossing, killing the horse, permanently crippling the mare, and destroying the wagon and harness. The appellant sought recovery, based on two allegations of negligence of the appellee, to-wit: (1) the excessive speed of the train; and (2) the unnecessarily loud blowing of the whistle. We discuss these.

I. *Excessive Speed of the Train.* All of the proof in the case was that the train was going faster than fifty miles per hour through the town of London. To show that such speed was negligence, the appellant introduced in evidence ordinance No. 30 of the town of London, Arkansas, reading in part as follows: "It shall be unlawful for any railway company to operate any train within the limits of the incorporated town of London, Arkansas, at a speed greater than 35 miles per hour." Assuming— but not deciding—that the town could, by such ordinance, lawfully restrict the speed of the train, as here; and also assuming that proof of the publication of the ordinance was waived or conceded: still we are of the opinion that the speed of the train was not shown to have had anything to do with the action of the team. Appellant said that he was in the store when he heard the train whistle for the first or west crossing, and that he went immediately to his team. He testified: "Q. What did you do? A. I started to get up in the wagon, and just as I started to breast over in the wagon they made a lunge forward. Q. Where was the train at that time? A. The train had gotten then right even with the team. Q. Before the team lunged? A. Yes, sir. Q. When did the team lunge? A. They lunged when he let out that loud shrill whistle when the train was even with the team."

This evidence shows that it was the whistle and not the speed of the train that caused the untoward action of the team. The rule is well established that negligence is not actionable unless such negligence was the direct cause of the damage. As said by Mr. Justice Mehaffy in *Mo. Pac. R. Co.* v. *Horner,* 179 Ark. 321, 15 S. W. 2d 994: "One is entitled to recover for negligence only when the negligence complained of causes the injury." See, also, cases collected in West's Arkansas Digest, "Negligence," § 56. Applying the rule of these cases to the evidence here, it is clear that the appellant made no case of actionable negligence based on the speed of the train; for it was not shown that the speed of the train caused the team to lunge or run away.

II. *Unnecessarily Loud Blowing of the Whistle.* The plaintiff testified: "I heard the train whistle for this other crossing; I started out of the store, he started his whistle above the crossing and held it down all of the way through. When the engine got even with the team he let out a continuous loud shrill blast, and the team became frightened, and I started to get to the wagon to get ahold of the lines. I was just bending over the wagon, there were no steps on the wagon. The team made a lunge and threw me against and off of the wagon. It sprained my arm——!" He further testified: "Q. You heard the whistle at the west crossing there in the town of London? A. Yes, sir. Q. After it whistled for this crossing tell the jury whether or not if it continued to whistle. A. Yes, sir; it continued to whistle. When it started whistling above the west crossing this engineer just held the whistle down all of the way through; never did stop whistling. Q. Was it an unusually loud whistle? A. Yes, sir."

It was established by many witnesses that the train started to whistle before it reached the west crossing, and continued to whistle until the engine had passed the east crossing; and likewise the fact was established that the whistle was loud, and that the team lunged and started to run away when the engine was even with the team. It was shown that the crossing whistle is two long blasts,

a short blast, and a long blast; and that this routine blowing was repeated from the time the blowing of the whistle began until the locomotive had passed the east crossing. The engineer testified that he first observed the team one-quarter of a mile away, and that the team was not then showing any excitement; and that as the train approached and the whistle continued to blow, the team showed no signs of nervousness until the engine was even with the team.

It was also shown by undisputed evidence that "there is only one way to blow a whistle; and that is to blow it." The engineer testified: "Q. After you went across the first crossing did you continue to whistle? A. I kept the whistle open—it is only a matter of about five seconds between the crossings. Q. Did you blow it often and loud? Were you blowing it loud? A. There isn't but one way to blow a whistle, and that is to blow it. You take an ordinary whistle, when you blow it, you blow it wide open, just like an automobile horn. Q. When you blow it, it blows? A. Yes, sir. Q. Can you blow it soft or loud? A. You would have to do an awful lot of tinkering. Q. Did you ever try to blow it soft? A. When you open the valve it is open. Just so much steam can go through the whistle. Q. What makes the whistle blow? A. Steam. It is just like an automobile horn, it is either on or off. Q. If you put it on full blast, it is on? A. Yes, sir; you have about 15 feet of iron pipes connected with it—and when you pull down it is open. Q. Why are some louder than others? A. Difference in the tone of the whistle. Q. Was this a high tone whistle or a low tone whistle? A. High tone whistle, locomotive whistle."

The whistle statute of Arkansas is § 11135, Pope's Digest (from § 34 of Act 71 of 1868), and reads as follows: "A bell of at least thirty pounds weight, or a steam whistle, shall be placed on each locomotive or engine, and shall be rung or whistled at the distance of at least eighty rods from the place where the said road shall cross any other road or street, and be kept ringing or whistling until it shall have crossed said road or street, under a penalty of two hundred dollars for every neg-

lect, to be paid by the corporation owning the railroad, one-half thereof to go to the informer and the other half to the county,[1] and the corporation shall also be liable for all damages which shall be sustained by any person by reason of such neglect.'' Since eighty rods is a quarter of a mile, we see that the law required the railroad company to blow the whistle or ring the bell, beginning one-quarter of a mile west of the west crossing, and to continue until the locomotive had passed the east crossing—since the crossings were only 300 feet apart. The railroad had the right either to ring the bell or blow the whistle, or do both, but it had to do one or the other.

Since the appellee's employees were complying with the statute, how, then, can the appellee be liable? The appellant's theory of liability is that the whistle was blown too loud. The appellee's defense is that the Arkansas statute does not limit or restrict the volume of the whistle, by requiring it to be soft or loud. A brief review of some of our holdings will show that we have never directly passed on this question:

1. There are cases holding railroad companies liable where the operators of the train let off steam from the engine, thereby frightening animals and causing damage. Some of these cases are: *Ry. Co.* v. *Roberts,* 56 Ark. 387, 19 S. W. 1055; *Ry. Co.* v. *Lewis,* 60 Ark. 409, 30 S. W. 765; *St. L. I. M. & S. Ry. Co.* v. *Transmier,* 106 Ark. 530, 153 S. W. 817; *St. L.-San Fran. Ry. Co.* v. *Young,* 175 Ark. 487, 299 S. W. 750. But the case at bar differs materially from these reported cases, because the letting off of the steam from the engine is not a statutory duty; while the blowing of the whistle is a statutory duty, and in the case at bar there is only the question of the blowing of the whistle.

---

[1] It is immaterial to this case, but worth noting, that § 34 of Act 71 of 1868 says "the other half to the state"; § 4960 of Gantt's Digest of 1874 says "the other half to the school fund"; and § 5478 of Mansfield's Digest of 1884 says "the other half to the county"; and the subsequent digests have followed the wording found in Mansfield's Digest. The change by Gantt was possibly because of § 1 of Act 130 of 1873; and the change by Mansfield was possibly because of § 212 of Act 114 of 1883.

2. There are cases holding railroad companies liable where the operators of the train blew the whistle at a time and place not required by statute. One such case is *Weil* v. *St. L. S. W. Ry. Co.,* 64 Ark. 535, 43 S. W. 967; but the case at bar is not such a case as the one cited. Here the signals were given in compliance with a statutory mandate. Even in the cited case Mr. Justice BATTLE made clear that the giving of statutory signals (as under § 11135, Pope's Digest) was not within the purview of that case, when he used this language: "In the absence of statutory regulations, as in this case, it was limited to the reasonable use of signals, and 'is liable for injuries caused by the whistle, when sounded carelessly or recklessly, or at an improper place, or when not required in the prudent working of its engines and trains.' "

3. There are cases holding railway companies liable where the team was at a crossing and became frightened, either from the giving of signals or the lack of signals. Some such cases are: *P. & N. W. R. Co.* v. *Franks,* 111 Ark. 83, 163 S. W. 180, Ann. Cas. 1916A 773; *St. L. S. W. Ry. Co.* v. *Everett,* 125 Ark. 428, 189 S. W. 42. But in the case here the team was 175 feet away from the track, and midway between the two crossings. The "lookout statute," § 11144, Pope's Digest, was not pleaded by the appellant.

4. There are cases holding railroad companies liable where it was shown that the operators of the train had acted willfully, wantonly, or maliciously. One case so declaring is *C. O. & G. R. Co.* v. *Coker,* 77 Ark. 174, 90 S. W. 999. But in the case at bar there was neither allegation nor evidence that the operators had acted willfully, wantonly, or maliciously, so the rule of these cases should not apply here.

5. There are cases holding railroad companies liable where it was shown that, after the operators of the train discovered the frightened team, they failed to exercise due caution to avoid injury, when by giving another signal instead of the loud whistle, the runaway could have been averted. One such case is *C. O. & G. R. Co.* v. *Coker,*

89 Ark. 270, 116 S. W. 216. The rule of such cases is bottomed on the humanitarian doctrine, or the doctrine of the last clear chance. But the rule of these cases could not apply here, because the engineer observed the team for some distance and the team did not become frightened until the train was even with the team. It was only five seconds between crossings; the engineer could hardly have stopped the whistle more quickly than 2½ seconds, and he did stop then; and the engine and two coaches had passed the east crossing before the team ran into the third or fourth car of the train.

The listing of these instances in which recovery has been sustained is not intended to cover every possible situation that might arise; but the listing does show that recovery in other cases has always been on some evidence more than merely the loud blowing of the whistle. If the tone or volume of the whistle, alone, is to be considered negligence, then it is for the Legislature so to enact, rather than for the courts so to declare.

Turning to other states, we find cases which also hold that loud blowing of the whistle is not, alone, evidence of negligence. In *Louisville & N. R. Co.* v. *McCandless,* 123 Ky. 121, 93 S. W. 1041, 29 Ky. L. Rep. 563, the Court of Appeals of Kentucky had before it a case where recovery was sought against a railroad company for the loud blowing of a whistle, which frightened a horse driven on a highway parallel with the railroad tracks. The only charge of negligence was the loud and excessive blowing of the whistle; and the Kentucky court held that a directed verdict should have been given in favor of the railroad company. In *Wheeler* v. *Wabash R. Co.,* 159 Mo. App. 579, 141 S. W. 472, the Missouri Court of Appeals likewise held that a verdict should have been given for the railroad company, where the only proof of negligence was the loud blowing of the whistle, which was blown in compliance with the statutory regulations. Other cases of similar import, but with slightly different facts, are *Lyons* v. *C. M. & St. P. R. Co.,* 28 S. D. 31, 132 N. W. 679, 35 L. R. A., N. S., 1219, and *Engelsen* v. *Spo-*

*kane P. & S. Ry. Co.,* 79 Wash. 39, 139 Pac. 599. There is a splendid annotation in 61 A. L. R. 1078, which cites cases from other jurisdictions, all going to sustain the rule that the loud blowing of a whistle, standing alone and without any other evidence tending to show negligence, does not make a case of liability against the railroad company. We so hold; and the judgment of the circuit court directing a verdict for the appellee is, therefore, affirmed.