Kapp *v.* Sullivan Chevrolet Co.

5-2384                                    353 S. W. 2d 5

Opinion delivered January 8, 1962.

[Rehearing denied February 12, 1962.]

*Roy & Roy,* for appellant.

*Reid & Burge; Frierson, Walker & Snellgrove,* for appellee.

CARLETON HARRIS, Chief Justice. This is an action for damages for personal injuries allegedly resulting from the breaking of the webbing of the passenger's seat belt worn by Mrs. C. W. Kapp at the time of a motor vehicle collision which occurred on highway 66 near Amarillo, Texas, on October 12, 1957. Mrs. Kapp was a passenger in a 1954 Oldsmobile, operated by her husband, C. W. Kapp, and owned by the Blytheville Water Company. The Kapp's vehicle collided with a 1956 Ford driven by Mrs. Robert Morales. The Morales car evidently skidded on a slick highway and crashed into the Oldsmobile. A third automobile, driven by James T. Arnold, which was following behind the Morales car, then hit the latter automobile. Two passengers were thrown from the Morales car and killed, and the Kapps received extensive and painful injuries. Mrs. Kapp's head hit the dashboard, and she suffered severe injuries, mainly about the head and face, including the loss of most of her upper and lower teeth, and related jawbone. Suit was instituted in tort[1] under negligence theories of product liability, by the Kapps against Sullivan Chevrolet Company of Blytheville, from which

---

[1] Subsequently, the Kapps instituted an action against Sullivan for personal injury damages grounded in breach of warranty. This suit is still pending in the trial court. Suit is also pending in federal court against General Motors and Davis Aircraft Products, Inc.

company the seat belt in question was purchased. The purchase was made by the Blytheville Water Company, employer of Mr. Kapp, and installed on the Kapp's Oldsmobile by Sullivan in December, 1956. Sullivan filed a third party complaint against General Motors Corporation, from which it acquired the seat belt, as a joint tortfeasor. The complaint against Sullivan alleged the liability of that defendant under the doctrine of *res ipsa loquitur,* and specific negligence, *inter alia,* as follows: insufficient webbing strength and inadequate webbing durability, improper installation, inspection, and failure to properly instruct Kapp in the use of the belt. It was further alleged that the quality of the seat belt was misrepresented, and that promotional advertising materials circulated by the company had motivated appellants' decision to purchase these particular belts; that the belts were not as represented. After the court, over the objections of appellants,[2] permitted the third party complaint to be instituted against General Motors, the Kapps amended their complaint to charge the third party defendant with certain acts of negligence. After also alleging that the doctrine of *res ipsa loquitur* applied against this appellee, appellants, *inter alia,* alleged specific negligence a follows:

(a) The General Motors belt did not possess sufficient webbing strength to properly withstand the impact stress of automobile collisions;[3]

(b) The belt and webbing material was not sufficiently durable to withstand ordinary wear, tear, and deterioration for a reasonable period of time. General Motors was further negligent by

---

[2] Appellants contended that they had a separate tort action against General Motors which should be preserved for future use, regardless of the outcome of the litigation against Sullivan. In amending their complaint, they asked for severance of the cause so that same would be heard as two separate negligent cases against Sullivan Chevrolet and General Motors, with separate juries at the time of trial.

[3] This belt was not actually made by General Motors, but rather by Davis Aircraft Products, Inc., of New York. General Motors, by contract, used these belts as optional equipment for its cars. Actually, Davis did not manufacture the nylon webbing used in its belts, but the record does not disclose which of several companies, engaged in manufacturing nylon webbing, furnished the webbing used by Davis.

(c) failing to design a crashworthy automobile seat belt or to specify or require suitable materials therein;

(d) selecting Davis as its supplier and failing to specify and require proper webbing tests by supplier and to supervise such tests;

(e) failing to itself properly test the product;

(f) selecting Sullivan Chevrolet as its distributor and installer of seat belts in the Blytheville community; Sullivan Chevrolet was not properly qualified nor equipped to discharge that function;

(g) failing to train Sullivan's workmen or to require training of that dealer's workmen to (1) detect flaws or weaknesses in seat belt webbing or (2) to properly install or test the belts when installation was complete, and

(h) failing to warn or inform the public of the limitations in safety or strength of the General Motors Corporation — Davis belts, or to mark or label the belts in that respect.

After the filing of several amendments, and answers thereto denying liability, the taking of discovery depositions, requests for admissions, and numerous motions, the case proceeded to trial on June 20, 1960, and continued until June 24th. At the close of all the evidence, the Sullivan Chevrolet Company and General Motors Corporation separately moved for directed verdicts, and the court granted these motions. From the judgment so entered, appellants bring this appeal.

The record in this case is voluminous; in fact, it is one of the largest transcripts ever filed in this Court. We think it well to state at the outset, that after close study of the allegations and the proof, we agree with the trial court that any verdict rendered for appellants, would necessarily be based on conjecture and speculation, and we have accordingly concluded that the evidence was insufficient to sustain a verdict against either Gen-

eral Motors or Sullivan Chevrolet Company. The basis for this conclusion will be hereafter discussed. In the meantime, we proceed to a discussion of some of the particular points urged by appellants as grounds for reversal.

First, appellants contend that the doctrine of *res ipsa loquitur* applies, and the case should have been submitted to the jury under that doctrine. Numerous pages in the brief are devoted to this argument, but we cannot agree with appellants, for all the elements necessary to permit application of the doctrine are not present. Among essential requirements are superior knowledge on the part of defendant as to the cause of the accident, the absence or unavailability of direct evidence of negligence, the existence of a sufficient duty on the part of defendant to use due care, and *the accident must be caused by an agency or instrumentality within defendant's exclusive control.* In 37 Words and Phrases, Res Ipsa Loquitur, page 488, paragraph 5, we find:

"The mere happening of accident does not justify recourse to 'res ipsa loquitur' rule in personal injury suit, but accident must further appear to be without explanation in light of ordinary experience, except on theory of defendant's negligence to render rule applicable."

In Bouvier's Law Dictionary, Vol. II, p. 2908, appears the following:

"When the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care."

Further:

"The doctrine is that when a thing which causes injury without fault of the person injured, is shown to be under the exclusive control of defendant and would not

cause the damage in ordinary course if the party in control used proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from defendant's want of care.''

In the instant case, we agree there was a duty on the part of each defendant to respectively use due care in the manufacture and inspection of the seat belt, and the installation of same in the Kapps' automobile. Likewise, we agree as to the unavailability of direct evidence of negligence on the part of the company. To trace the particular history of the belt in question is impossible. The seat belts sold by General Motors, including this one, were neither numbered nor dated, and of course, proof of specific acts of negligence in the manufacture of the belt cannot be made. But we cannot say that the mere fact the belt broke shows it was defective, for in the first place, the proof reflects that no safety belt can withstand too great a stress upon it, and though this were not so, still an essential element for the application of the doctrine is missing, for this belt was not under the exclusive control of defendants. The proof reflects that the belt had been installed in the Oldsmobile and used for a period of approximately ten months before the collision in which it broke. During this period of time, it was used and controlled by appellants. Like any other article, a seat belt is subject to misuse, *i.e.,* it can be weakened, for instance, among other things, by closing a door on it. Whether this particular belt was weakened by misuse, as far as the doctrine of *res ipsa* is concerned, is beside the point; *the fact remains that the instrumentality allegedly causing the injury was not under the exclusive control of either appellee for the ten months' period.* This precludes the application of the doctrine. Though we do not find it necessary to go so far in determining this case, it is interesting to note that the Supreme Court of Nebraska, by unanimous opinion, in the case of *Sleezer* v. *Lang,* 102 N. W. 2d 435, held that ''a safety belt is not such a piece of equipment that the doctrine of *res ipsa loquitur* applies thereto in case it **breaks.''**

Appellants contend that they were prejudiced by the action of the court in permitting General Motors to be made a third party defendant by Sullivan. This contention is discussed rather at length, but we do not agree. It is true that General Motors was not a necessary or indispensable party as far as Kapp's action against Sullivan was concerned, but under the allegations of Sullivan's third party complaint, the latter was entitled, under the Uniform Contribution Among Tortfeasors Act (Ark. Stats. Anno., § 34-1001) to join General Motors as a third party defendant. Of course, one of the primary purposes of the Act is to prevent the multiplicity of suits. Appellants' principal allegation of prejudice was that the third party proceedings prevented a consolidation of the separate negligence and warranty actions brought by appellants against Sullivan. However, the record reflects that appellants subsequently withdrew the motion to consolidate. At any rate, it is admitted that Sullivan might well have a right of action over and against General Motors, and we have held that the invoking of the remedy afforded by the Act is discretionary with the trial court. We are unable to say that the court here abused its discretion in permitting the third party complaint to be filed.

Appellants complain that they were not permitted to present evidence as to appellees' tort of negligent misrepresentation through advertising, and error was thereby committed by the court. We very quickly reject this contention. In the first place, none of the excluded advertising specifically referred to seat belts, and no representation concerning seat belts is found in such advertising. Rather, in general, the advertising deals with the automobiles sold by General Motors, such as an advertisement in Life magazine captioned, "General Motors Leads the Way"—"General Motors Products are Known and Trusted Around the World—Wherever Wheels Turn and Propellers Spin"—"The New 1956 General Motors Cars Are Way Out in Front in Performance and Safety." Certain advertising by Sullivan, appearing in the Blytheville Courier News, was offered,

such as "We've Got the Know How . . . Factory Trained Mechanics . . . Experts . . . Factory Approved Methods"—"The Leaders in Quality Service." The only reference to seat belts in any of the advertising is purely a mention in a few ads that seat belts can be obtained as optional equipment, *but there is no representation at all as to the quality or performance of the seat belts.*

In addition, the evidence reflects that Kapp did not rely upon any representations made through advertising in purchasing the belts from Sullivan Chevrolet Company. He simply stated that he purchased the belts because the president of his company instructed him to do so. Kapp apparently selected Sullivan because he had already been doing business there, and was well acquainted with the foreman of the shop.

Appellants next complain that their rights to the use of discovery were abridged. To consider each alleged grievance would constitute an opinion in itself, for more than an entire volume of the transcript relates to motions, discovery interrogatories, requests for admissions, and related pleadings. Offhand, it would appear that discovery procedures were utilized, at least, as fully in this case as in any to ever be filed before the Court. In December, 1958, appellants took the discovery deposition of Charles M. Love, claims adjuster for U. S. F. & G. Insurance Company. This company carried the liability insurance on the Oldsmobile driven by Kapp, and likewise had issued a liability policy covering liability of Sullivan Chevrolet Company for any negligence in connection with the operation of its shop. In January, 1959, motions were filed for the production and inspection of certain documents, which apparently were complied with. In the following April, appellants took the discovery deposition of all employees of Sullivan Chevrolet Company who were connected with the seat belt sale or installation. In the same month, interrogatories were directed to General Motors Corporation under the discovery act. In May, a motion was directed to Sullivan Chevrolet to require the production for in-

spection and copying of the various investigative files
of the liability insurance carrier. An order was entered
by the court directing Sullivan to produce for appel-
lants all signed or court reporter statements of wit-
nesses, and memoranda made of the testimony of other
witnesses, interviewed in the original investigation made
in Texas following the accident. The Kapps complain
that this last did not go far enough in that appellants
were seeking access to the original reports made by the
carrier. Quite a lengthy argument is directed to this
point, but we find no prejudicial error. For one thing,
there is no showing that the court's order did not give
access to all the statements and memoranda contained
in the original investigation file. While it is not entirely
clear, appellants are apparently complaining that the
comment of investigators and correspondence with at-
torneys was omitted from the order. Appellants say that
the information was necessary in regard to "the measure-
ments, the facts of the accident, explanation, and
other pertinent data." It is quite difficult to determine
the definite information sought by appellants,—or the
use to be made of same, — or why the information
furnished was inadequate. Without discussing the pro-
priety of the request, let it be said that it definitely
appears from the evidence introduced by appellants at
the trial, relative to the manner in which the accident
occurred, that the information sought was obtained, either
from the statements and memoranda made available by
the court order, or from other sources. In other words,
there was no showing of prejudice.

Discovery interrogatories were served on Sullivan
Chevrolet Company, answers filed, objections filed
thereto, and supplementary interrogatories were subse-
quently directed to Sullivan. Supplementary interroga-
tories were also directed to General Motors. Appellants
filed requests for admissions against both appellees. This
was followed by a second request for admission with
numerous exhibits annexed. Appellants complain that
Sullivan, as president of the Chevrolet company, with-
held valuable information under the guise of giving only

his personal knowledge. It appears from reading the interrogatories and answers, that Sullivan gave all the information of which he had personal knowledge or had been told, including the sources of his information. In answer to the first interrogatory propounded to Sullivan, the names of all persons known to have any information concerning relevant facts were furnished, together with addresses. Sullivan gave the substance of the reports furnished him by General Motors, Davis Aircraft and Edward Dye (expert appearing on behalf of appellees at the trial of the cause), to the effect that the belt broke because the force of the impact was so great that no belt could have withstood such force, and also because it appeared that the belt had been subjected to abuse. Appellants complain that appellees failed to furnish them with the names and addresses of experts in the seat belt field. We do not understand this contention, for the transcript shows that information concerning the experts consulted by appellees, including names, addresses and identity, was furnished; also, appellees listed the names of leading experts in the field. The transcript likewise reveals numerous names of employees of General Motors and Davis Aircraft Products, who had knowledge of seat belt manufacturing operations. Appellants say they were not given sufficient information, but they filed no objection to the sufficiency of the answers, and apparently never made any effort to take the deposition of any of the persons named. Actually, appellants' own requests for admissions establish that appellants themselves knew and had the addresses of numerous manufacturers of seat belts, some close by, from which expert information could have been obtained.

Appellants further complain that discovery was not permitted relative to changes in belt specifications subsequent to the sale of this particular belt. Of course, the question in issue was due care in the manufacture of belts based upon applicable standards of knowledge and practices at the time this belt was manufactured. Any changes subsequently made on the basis of advances in

the seat belt field would not be evidence of negligence in the manufacture of this belt. *Jonesboro L. C. & E. R. Co.* v. *Kirksey,* 204 S. W. 208 (not reported in Arkansas Reports). Appellees objected to particular requested admissions, including a request that appellees admit the alleged specifications of several other manufacturers producing seat belts. Appellees were requested to admit that the specifications of these manufacturers called for certain loop strengths. This was not competent in the absence of a showing that the practice of the named companies constituted accepted standards of the industry. The fact that some competitive companies used varying specifications from those of appellees, standing alone, would have no probative value. *Jones* v. *Malvern Lumber Co.,* 58 Ark. 125, 23 S. W. 679.

Appellants complain that the official reports of the Texas Department of Public Safety relative to accident investigations are, under Texas law, confidential, and appellees refused to admit that appellants had made efforts to obtain information concerning the reports which had been refused. We fail to see how appellants were prejudiced. The deposition of the investigating officer, Fred F. Givens, a Texas highway patrolman, was taken. The examination of this officer was rather extensive, and supplied all necessary information relative to the official investigation of the collision.

We have examined each alleged error under this contention. Some deal with failure of appellants to answer requests for admissions; some deal with insufficiency of the answers; some deal with the court's action in sustaining objections to particular questions; some deal with matters that address themselves to the discretion of the court,—but we find no ruling that resulted in prejudice to appellants.

A discussion of other points relative to the trial in this case is unnecessary, and would be purely academic, for the outcome of the litigation really depends upon the answer to two questions: (1) Was there sufficient evidence of negligence on the part of either General

Motors or Sullivan Chevrolet Company, or both, to make a jury question, and (2) Was the negligence of either a proximate cause of the injuries sustained by Mrs. Kapp? Perhaps the second question is more simply stated as follows: Were the injuries sustained by Mrs. Kapp the result of the breaking of the seat belt? Before appellants can prevail in this litigation, not only must the first question be answered in the affirmative, but also, the last question must be answered in the same manner. Before discussing the alleged negligence of either appellee, we think a brief general discussion of seat belts would be in order. Undoubtedly, the first comment that should be made (and this is undisputed) is that a study of all available seat belt literature establishes that *no seat belt is manufactured which will remain unbreakable under all conditions*. As admitted by General Motors, ''Automobile safety seat belts are for the purpose of immobilizing persons traveling in motor vehicles during traffic accidents and other period of sudden deceleration. Each should keep its user 'tied down' in survivable crashes which leave the passenger compartment of such motor vehicle substantially intact.'' It does appear that certain regulations should be met for safety purposes. The safety belt assembly (including webbing, release mechanism, and all integral parts), as required by the Department of Commerce for aircraft belts (adopted as the specifications in the contract for the making of the Davis belt used in this litigation), calls for a 3,000 pound loop load, *i.e.,* 1,500 pounds to each strand, or specimen, of the seat belt. A further requirement is an additional 50% margin of strength in the webbing itself of 2,250 pounds per strand, which makes a total loop load, as far as the webbing is concerned, of 4,500 pounds, though the belt overall is only required to hold 3,000 pounds.[4] Both W. D. Wells, who testified for General Motors, and Guy Keith, who testified on behalf of appellants, agreed on these requirements.

---

[4] Seat belts ordinarily break at an assembly point, rather than in the webbing.

Another fact which is established, and agreed upon by seat belt experts, is that at the time of impact, most adults (and probably children from seven years upward) will hit their heads on the instrument panel when wearing a seat belt. The belt is secured around the pelvic region of the body. At the time of impact, the belt stretches, the legs start up due to inertia forces, and the total body is bent forward in a u-shaped manner, the feet going up and the head coming down. According to testimony, an adult ordinarily hits the top of the dashboard rather than the side; without a belt, the person facing the direction in which the car is moving, would be thrown forward and upward at an angle of 30 to 40 degrees, and the head would strike the windshield, rather than the dashboard. Irrespective of the fact that a belt is securely fixed, there will still be about two inches of motion in the hips. The weight of the person wearing the belt also influences the stretch of the belt.

Expert evidence was offered on behalf of appellants by Guy Keith and Guy Treat, and on behalf of appellees by Edward R. Dye, W. D. Wells and Norie Higuchi.

We first examine the evidence of negligence against Sullivan Chevrolet Company that is relied upon by appellants. It is contended that the belts were improperly installed, and this faulty installation occasioned the breaking of the seat belt. The contention of improper installation was based on the fact that the specifications provided the seat belt should go around the end of the seat, whereas they were installed between the end of the seat and its plastic trim. Further, it is contended that the instructions that came with the belts related to installation in a Chevrolet, though these belts were installed in an Oldsmobile. There is not one line of evidence in the record to the effect that the method of installation caused the belt to break. The positive testimony of witnesses Dye and Wells was to the effect that the installation of the belts in an Oldsmobile, rather than in a Chevrolet, would not affect the strength of the belt, and they were of the view that the belt would

be as sturdy and strong in the former automobile as in the latter. Mr. Dye testified that the trim around the seat was Royalite, a light weight plastic, and it would not damage the seat belt. Mr. Wells stated that the method of installation would not have prevented the belt from carrying its required loop load.

Appellants assert that the belt was installed by an inexperienced employee, and that the completed installation was not properly inspected by the foreman. This assertion is based upon the fact that the employee who installed the belt testified that he had only installed one other, and the completed job was not inspected by the shop foreman. This allegation contains the same weakness as the preceding argument, *i.e.*, there is no proof that improper installation (if any), or a failure to make inspection after installation, contributed to the breaking of the belt.

It is next argued that Sullivan Chevrolet should have warned appellants of the limitations of the seat belt, and how to properly care for it. Considering the last first, a seat belt is not inherently dangerous, as contrasted with such properties as dynamite, nitroglycerin, other explosives, or certain drugs that are extremely dangerous unless properly used. Seemingly, the complaint is that Kapp was not told that he should be careful that a door did not slam on the belt, or advised of other similar misuse. This contention is answered completely by Mr. Kapp's own testimony that the belt was not damaged in any manner prior to the collision. According to his testimony, it was not frayed or water soaked, nor did it show any signs of wear or deterioration in any way. He stated it was impossible for the belt to ever have been caught in the car door "because the way it come between the seat and the door, this buckle here." He also stated that the part of the webbing that broke was never exposed to the hot sun, and the witness emphasized that these answers were correct. It would therefore appear that, even if a duty existed to brief Mr. Kapp as to proper use of the belt, according to

his testimony, no damage was occasioned by the failure to do so.

We fail to see any significance, in a case of this nature, of a failure to explain the limitations of the belts. Apparently, the complaint is that Mr. Kapp was not informed that the seat belt would only protect up to certain limits. But, if Kapp had been advised that the belt's strength was only 3,000 pounds, would that fact have prevented this collision? Would it have prevented the Morales' car from skidding into his automobile? Would he have driven more slowly? Of course, simple logic tells us that Kapp did not rely upon the seat belts for protection from all consequences of a conceivable accident, and thereby relax his caution.

Let us now discuss the proof, and contentions, as related to General Motors Corporation. Mr. Dye, a resident of New York, is a professional research engineer, and has been working in this field for approximately 35 years. This witness appears well qualified in the seat belt field. From the testimony, his qualifications appear as follows:

"Since graduation from school in 1924, I was with Indiana State Highway Department designing and building steel and concrete bridges; job as assistant professor of engineering and teaching of subjects in engineering mechanics and engineering, including strength of materials, kinetics. I finally became head of civil engineering at North State College. At the same time I had a professional engineering organization in which I carried out engineering. I was assistant engineer of the Yellowstone National Park for eight construction seasons; that is, during the summer seasons, designed, built, supervised construction of all kinds of civil engineering projects. I then became crash analyst and head of the Kinetic Test Department of Douglas Aircraft at El Centro, California, designing and building new aircraft, including dive bombers, and T. A. C. bombers; then Curtiss-Wright Research Laboratory, 1943, assistant head of Physics Department at that laboratory. I was in se-

quence head of the Developmental Engineering, and director of the Developmental Division. I was head of the Industrial Division, and finally my position there as head of the Safety Design and Research Department. During my some sixteen and one-half years at the Curtiss-Wright Research Laboratory, which became Cornell Aeronautics Research Laboratory, in January, 1946, I conducted many research projects in the general field of protecting humans against contact blows and sudden shock forces, including airplane crashes and auotmobile crashes, and conducted research toward preventing those conditions to the human occupant. I am now conducting my own research, called New Products. I conduct accident investigations such as this one. I carry out research for small industries particularly in the protection field.'' Dye has spent the last fifteen years specializing in the field of safety and protection, including seat belts from the commencement of the use of these belts in automobiles. In connection with his duties as head of the Safety Design Research Department of Cornell Aeronautics Research Laboratory, and a member of the Transportation Safety Research Committee of Cornell University, projects were conducted for the office of Naval Research, Medical Science Division, research for General Motors in the safety of crashing automobiles, research for Hickock Company, manufacturer of seat belts, and research for Chrysler Motor Company. Because of his eminence in this field, Dye was invited to testify before a subcommittee of the Committee on Interstate and Foreign Commerce of the 85th Congress. This Committee conducted hearings in an effort to compile all data and research known regarding seat belts.

Dye was asked a hypothetical question based on the circumstances surrounding the collision, as shown by previous testimony, and including the weights of the vehicles involved, the speed of each, and subsequently the weight and height of Mrs. Kapp. This question was directed to whether the witness was able to arrive at a computation that would show the velocity or speed of the

vehicles at the moment of impact "assuming that Mr. Kapp took his foot off the accelerator the moment the car started to skid when they were 200 feet apart." In response to this question, the witness answered that he was able to make a computation, and he first explained the factors considered. This entailed the use of certain formulas, which, to relate here, would be of no particular benefit, and after minutely explaining the method used in arriving at his conclusion, Dye stated that the minimum number of G's[5] exerted on the belt would be 46.6, or a potential on the belt of 5,030 foot pounds. He stated that the peak load could well be much greater, up to 90 G's, and therefore concluded that the potential force on the belt was somewhat between five and ten thousand pounds. This, of course, was greatly in excess of the required strength of the belt. W. D. Wells, senior staff assistant to the chief engineer of the Fisher Body Division of General Motors, and Nori Higuchi, chief engineer for Davis Aircraft, substantially concurred in the conclusions reached by Dye.

Guy Keith, principal expert witness for appellants, is a graduate of the University of Oklahoma in civil engineering, a licensed engineer in the state of Arkansas, a member of the American Society of Civil Engineers, Oklahoma Society of Professional Engineers, National Society of Professional Engineers, Tau Beta Phi, Sigma Tau, and associate professor at the University of Oklahoma. He listed his experience as follows:

"Right after graduation in 1944, I went with the Seabees on active duty in an engineering capacity. After that, I worked for a steel company in design and detailing of steel for building of bridges and buildings. After that, planning engineer for Ideal Cement. After that, with an engineering firm on turnpikes, and 1950 with a firm engineering buildings, structures, roadways, schools, and roads, and in recent years I have been made vice-president of that organization."

---

[5] G - a unit of force applied to a body at rest equal to the force exerted on it by gravity.

Keith, after explaining his reasons, gave the figure of 1,713.6 foot pounds, as the force exerted against the belt, which was, of course, well within the limits of the 3,000 pound overall loop load, and the 2,250 pounds per strand (webbing). Subsequently, on cross-examination, he admitted that this figure could be doubled. Appellees vigorously argue that Keith misapplied the formula, and his result was therefore erroneously reached. It is also pointed out that Keith, in reaching his conclusion, did not consider the weight or speed of the Morales' Ford. While it would appear that the weight and speed of the Ford would be pertinent factors in determining the magnitude of the crash,[6] we find it unnecessary because of reasons hereinafter set out, to enter into a discussion of this contention, or whether the formula was misapplied. It does definitely appear that Mr. Keith is not especially versed in the seat belt field. During the course of cross-examination of this witness, the following facts were elicited from Keith: that his experience with elastic propensity of nylon and other fibers is extremely limited, and he had done no work in this line before the instant case; his familiarity with the elastic propensity of the human body is the same as that of the average man; he has made no tests in that field; he did not take the elastic propensity of the human body into consideration in his calculations; his experience relative to the crash of automobiles was limited to personal experience: "I've had several wrecks myself."

Guy Treat, an associate of Keiths, also testified on behalf of appellants, and his views were similar to those of that witness. Like his colleague, he was without experience in the seat belt field, never having conducted any experiments or tests.

Appellants devote a number of pages to the contention that the company was negligent in not marking the

---

[6] For example, it certainly seems that the result, to both the automobile and front seat occupant, of a collision between a Chevrolet (occupied by a passenger wearing a seat belt) and an Austin would differ greatly from that of a collision between a Chevrolet and a Cadillac. Likewise, in both instances, we would think the result would be far different if the cars were traveling 30 m.p.h., rather than 60 m.p.h.

belts. While it is true that a date or number on the belt would be of tremendous aid to appellants in their effort to prove specific negligence, we are unable to agree that this omission was, in itself, negligence. Of course, the fact that the belt was not marked in any manner, dated or numbered, did not contribute in any manner to its breaking. It might well be true that negligence could be found against a company that, for instance, sold unmarked belts that were several years old, but that situation does not exist in the case before us. The contracts entered into between General Motors and Davis Aircraft covered a nine months period, January 1, 1956, to October 1, 1956. Kapp purchased the seat belt in question from Sullivan in December of 1956. The evidence shows that nylon in storage will last almost indefinitely, and the proof is undisputed that a seat belt in use, under normal conditions, will last at least between one and one-half to two years without serious danger of deterioration. It therefore follows that this particular belt could not have been more than eleven or twelve months old when Kapp purchased it. Likewise, it was alleged that the belt was not properly tested. The proof is positive that the particular belt could not be tested,[7] for a proper test would have destroyed its strength and durability. The manufacturer of the belts did make "spot checks", but testing an individual belt would destroy the usefulness of that belt.

---

[7] From the testimony of Nori Higuchi, chief engineer for Davis: "Q. About how many belts did you test out of each lot? A. I would say it depended upon the size of the lot. Q. Assuming your average lot you testified to, one hundred fifty to two hundred belts. A. Test out of a lot that size, I would say one belt. Q. One belt out of every one hundred fifty? Is it not true to say you spot check these belts? A. That is the only way we can do. Q. A ratio of one to one hundred fifty? A. Approximately so. Q. In making your tests, will you tell us exactly your procedure used? A. We have a hydraulic testing machine. Q. What is the name of that machine? A. No particular name. Just a hydraulic cylinder to which we have a dynamometer. Pull that to 1,500 pounds and examine it for any defects. If no defects in the belt, we considered it satisfactory. Q. What happened to the belt you used after you pulled it to 1,500 pounds? A. We could no longer use it. Q. State whether or not when a belt has been loaded so it has broken, say a belt like that, after the belt has been broken, it is impossible to make a test of its pre-accident strength? A. Yes. Q. What—? A. Since it has been subjected to the load, there is some weakening to it."

Appellants assert that in some respects, Mrs. Kapp's injuries were worse than those of her husband, and he was not wearing a seat belt; that though it is true she remained in the automobile (while some occupants of the Morales car were thrown to the highway and killed), her husband also remained in the car. Apparently, the purpose of this argument is to demonstrate that Mrs. Kapp's injuries were occasioned by wearing the belt. This argument is fallacious, for Kapp's body was restrained by the steering wheel. Photographs show this wheel to have been forced considerably upward toward the top of the car. The abstract does not reflect the injuries sustained by Kapp, but does reflect that he spent five months in the hospital, and was not available for employment for another additional six months. The strongest evidence offered by appellants was that of Keith, but we do not think his testimony placed in issue the question of negligence. Keith did not point out any fact that caused the belt to break; of course, he did not know if the belt had been subjected to any unknown factors prior to the breaking. As heretofore mentioned, he admitted that the amount of force he estimated to be exerted against the belt could, under some circumstances, be doubled.[8] Likewise, he stated that he was not telling the jury that the total maximum force exerted on the belt was never more than 15.3 G's (equaling 1,713.6 foot pounds). In other words, Mr. Keith's testimony as to the force applied to the belt was quite indefinite, and after all is said and done, a guess.

In *Martin* v. *Arkansas Power & Light Company,* 204 Ark. 41, 161 S. W. 2d 383, DeWitt Martin, a termite exterminator, working under a house, came into contact with an electric wire, which caused his death by electrocution. His brother attempted to extricate DeWitt, and received injury in doing so. Suit was instituted against appellee charging negligence. This Court held that the court should have directed a verdict for the defendant, and, *inter alia,* stated:

---

[8] From his evidence: "Q. Talking about 15 G's on this belt, if the load is a sudden or shock load, it might have been two to one, mightn't it? A. It might have been two to one, yes, sir."

"'The transformer stepped this current down to 110 volts for domestic service, and there is no testimony that the transformer was out of order or that it was not properly functioning. There is testimony that both the primary and secondary wires passed through the tops of two trees and were adjacent to and may have at times come in contact with some of the branches of these trees which were between the transformer and the Bynum residence, and it is appellants' theory that the current from the high tension line was shorted or diverted to the service line by reason of contact with these limbs, causing an excess voltage on the service lines which killed DeWitt Martin and injured Clifton. Their expert witness said that it was possible for the current to be so diverted and that, in his opinion, that is what caused the injury. He said that a green tree limb was not a good conductor, but that, in his opinion, it was good enough to divert sufficient current to cause injury and death. This appears to be appellants' whole case, except some reliance is placed on an alleged defective ground wire on the third wire of the service circuit. We think the evidence given by the expert is lacking in definiteness and certainty. It is more or less speculative and conjectural. His conclusions depend upon assumed facts, such as a limb being a conductor and that if it were, why would not the current be grounded by the tree itself; that the same limb would have to contact both the primary and secondary wires at the same time and the latter at a point not insulated; and that the tree would not ground the current.''

We have concluded that there was not sufficient evidence of negligence on the part of either appellee to justify submitting the case to the jury. We have already said that the doctrine of *res ipsa loquitur* does not apply, and it is evident that no specific defect in the belt was established. Appellants' entire case rests upon conjecture and speculation. Several *possible* causes of the break are argued, but in truth, they are only *possibilities,* and do not reach the status of probabilities. Negligence

cannot be established by guess work. As stated in *Henry H. Cross Co.* v. *Simmons,* 96 F. 2d 482, a decision under Arkansas law:

"To submit to a jury a choice of possibilities is but to permit the jury to conjecture or guess, and where the evidence presents no more than such choice it is not substantial, and where proven facts give equal support to each of two inconsistent inferences, neither of them can be said to be established by substantial evidence and judgment must go against the party upon whom rests the burden of sustaining one of the inferences as against the other."

In *Glidewell* v. *Arkhola Sand & Gravel Co.,* 212 Ark. 838, 208 S. W. 2d 4, this Court said:

" 'Conjecture and speculation, however plausible, cannot be permitted to supply the place of proof,' and in *Turner* v. *Hot Springs Street Railway Company,* 189 Ark. 894, 75 S. W. 2d 675, we find this language:

'The trial court was correct in directing a verdict for appellee, because the testimony adduced by appellant was not sufficient to show that the injuries received were proximately due to any negligence of appellee. No witness testified that appellant's fall was proximately due to the small pieces of snow and ice afterwards seen in the vestibule of the street car. It is true, the jury might have guessed or speculated that her fall was caused by stepping upon the small pieces of ice and packed snow in the vestibule of the street car, but, on the other hand, it was equally as probable that her fall was caused by packed snow or ice which had accumulated on her own shoes. The point is, juries are not permitted to guess or speculate as to the proximate cause of an alleged injury, the burden resting upon appellant to show by a preponderance of the evidence that her injuries were caused by some negligent act or omission of appellee.' "

In the same case, quoting from an earlier case, we said:

"It is not allowable, under the rules of evidence, to draw one inference from another, or to indulge presump-

tion upon presumption to establish a fact. Reasonable inferences may be drawn from positive or circumstantial evidence, but to allow inferences to be drawn from other inferences, or presumptions to be indulged from other presumptions, would carry the deduction into the realm of speculation and conjecture.''

The fact that appellees *may* have been guilty of negligence is not sufficient. Mr. Keith's evidence was speculative and conjectural; of course, Dye's evidence involved many of the same elements of conjecture, but appellants must fail, for on them rests the burden of establishing their case.

Were it otherwise, *i.e.,* if we found sufficient evidence of negligence to say that a jury question was made on this issue, still, appellants could not prevail. Negligence alone is not sufficient. It must be established that such negligence was a proximate cause of the damages suffered. Who can say that the particular injuries complained of were caused by the breaking of this belt? Actually, in this accident, beginning and ending ''in the snap of a finger,'' one can only speculate as to *when* the belt broke. The testimony reflects such conjecture. Who can say that these injuries were not occasioned by the crash of the Morales' car into the Oldsmobile? Certainly, as shown by the record, injuries were claimed, and recovered, from the Morales' insurance carrier. It is not sufficient to show that the breaking of the belt *could* have caused the injuries complained of. Our feeling is expressed in the language of the Missouri Supreme Court, in the case of *Stone* v. *Farmington Aviation Corp.,* 232 S. W. 2d 495. In that case, Stone instituted suit against Farmington for injuries sustained in the crash of an airplane rented by Stone from the defendant. Stone alleged that the seat belt broke on the rear seat, and caused his wife to be thrown against him, thereby occasioning his injuries. He alleged ''that the breaking of the rotten and defective belt was the direct and proximate cause of his injuries.'' After reviewing the evidence, the Court said:

"* * * before recovery can be allowed plaintiff must prove his case as laid and his proof must take his case out of the realm of conjecture.

Who can say from these facts (there is no proof) when or why the belt broke? It appears only that after the crash it was found to be broken. Who can say from these facts (there is no proof) that except for the breaking of the belt plaintiff would not have been injured? Under the instant facts, such a conclusion is so unlikely and improbable that it must be instantly rejected. Who can say from these facts (there is no proof) that, assuming the breaking of the belt permitting Mrs. Stone to be thrown against the back of the plaintiff's seat, that such fact contributed in any degree to the injuries plaintiff received in this crash, or that his injuries were any increased thereby? Only with guess and speculation could any one hazard an answer to those questions. Proximate causation here is left wholly within the field of conjecture and speculation. Many things must be assumed, and inference must here be piled upon inference to hold that plaintiff made a submissible case. We have no proof and no basis for allowable inference as to the negligence as alleged in the petition. Upon this record we cannot escape the ruling that no submissible case was made upon the theory presented. It is axiomatic that judgments based on speculation and conjecture cannot stand. For the above reasons the judgment appealed from cannot stand."

Finally, it is asserted that the trial court erred in denying appellants' motion for a new trial on the basis of finding newly discovered evidence from eyewitness James T. Arnold. Arnold was the operator of the third car involved in the collision. A full discussion of this contention would only unduly extend the length of this opinion, for we find no merit in same. Appellants, in moving for a new trial, attach to their motion a verified statement of Arnold, wherein he states that the speed of the Morales car was only 25 to 30 miles per hour rather than the 52 1/2 to 60 miles per hour which was the basis of the calculations of the experts; likewise, he

stated that the speed of the Kapp vehicle should be reduced to 35 miles per hour[9]. It is apparent from the record that appellants were aware for many months prior to the trial that Arnold was an eye-witness. In fact, approximately six months before the case was tried, requests for admissions were filed showing that appellants had in their possession at that time the name and address of Arnold, and considerable information relative to details of the accident. Appellants had two suits pending in the U. S. District Court in Jonesboro against Davis Aircraft Corporation and General Motors, and compulsory process was available to have compelled the attendance of Arnold for the taking of a deposition in Chicago. Appellants say the expense was too great to obtain this testimony, but it is self-evident that such expense would not compare with the expense of a second trial of this case. Be that as it may, we find no merit in the contention.

Affirmed.

McFADDIN and JOHNSON, JJ., dissent.

ED. F. McFADDIN, Associate Justice, dissenting. It was established beyond doubt that the seat belt broke in the automobile collision and that Mrs. Kapp was injured. The plaintiffs claimed that the seat belt was defective; and this was denied by the defendants. So one of the main issues was whether the belt was defective. At the conclusion of all the evidence the Trial Court instructed the jury to return a verdict for the defendants, Bob Sullivan Chevrolet Company and General Motors Corporation; and, thereby, the Court declared that the plaintiffs had not presented any substantial evidence to sustain their allegation that the belt was defective. The plaintiffs assign as error the action of the Court in granting this instructed verdict for the defendants; and I think this assignment possesses merit. Therefore, I dissent from the affirmance by this Court.

---

[9] The speed of this vehicle had been calculated at 50 to 55 miles per hour.

The rule established by a long line of decisions is, that in determining whether the Trial Court committed error in directing a verdict for the defendant the Supreme Court gives the evidence for the plaintiff its strongest probative force. *McAllister* v. *Calhoun*, 212 Ark. 17, 205 S. W. 2d 40; *Garner* v. *Mo. Pac. RR. Co.*, 210 Ark. 214, 195 S. W. 2d 39; and *Smith* v. *Mo. Pac. RR. Co.*, 208 Ark. 40, 184 S. W. 2d 951. It is my opinion that the evidence was sufficient to take the case to the jury on the question of whether the belt was defective.

The witness Guy Keith testified: that the weight applied against the seat belt in the collision in which Mrs. Kapp was injured was 1,713.2 pounds; that the seat belt should have withstood a weight applied against it of 4,500 pounds; and yet this seat belt broke with less than 2,000 pounds weight applied against it. The witness Guy Treat testified to the same effect; and I maintain that the testimony of these two witnesses made a case for the jury on the question of whether the seat belt was defective.

The Majority Opinion says: ''We have concluded that there was not sufficient proof of negligence on the part of either appellee to justify submitting the case to the jury.'' If there was substantial evidence to show that the belt was defective, then that issue should have been submitted to the jury; and I maintain that when it was shown that a belt that should have withstood 4,500 pounds of applied pressure broke when less than 2,000 pounds of pressure was applied, there was sufficient testimony to take the case to the jury on the question of whether the belt was defective.

Finally, the Majority Opinion says that the plaintiffs fail to show that the breaking of the belt was the direct and proximate cause of Mrs. Kapp's injuries. I maintain that the plaintiffs were not required to offer such proof. The plaintiffs offered proof (a) that the belt was defective; (b) that it broke; and (c) that the breaking of the belt concurred with other factors to result in Mrs. Kapp's injuries. The plaintiffs made a

clear case of concurring negligence; and, when concurring acts of negligence are shown, a case is made for the jury as to the proximate cause of the injury. *Barnes* v. *Hope Basket Co.*, 186 Ark. 942, 56 S. W. 2d 1014; and *Oviatt* v. *Garretson*, 205 Ark. 792, 171 S. W. 2d 287.

I respectfully dissent from the Majority Opinion which affirms the action of the Trial Court in instructing a verdict for the defendants.